**Randolph BURT, Sr.**

v.

**J.P. MITCHELL, et al.**

**Civ. A. No. 83–0737–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

May 10, 1984.

Barbara Vann (Court Appointed), McGuire, Woods & Battle, Richmond, Va., for plaintiff.

Richard F. Gorman, III, Asst. Atty. Gen., Richmond, Va., for defendants.

## OPINION

WARRINER, District Judge.

On 7 March 1984, the Court granted summary judgment in favor of defendants as to two of plaintiff's claims. The Court appointed an attorney as counsel for plaintiff and directed that the parties file briefs as to plaintiff's final claim. On 28 March defendants filed a motion for summary judgment. Plaintiff filed a response on 5 April and defendants filed a rebuttal on 11 April. The motion is now ripe for consideration. The Court has jurisdiction under 28 U.S.C. § 1343.

Plaintiff, an inmate at Powhatan Correctional Center, alleges that on 7 December 1981, he notified the officers on duty that someone had attempted to set a fire in his cell. On the same day a fire in plaintiff's cell destroyed most of his personal property. Plaintiff alleges that the officers were negligent in not properly watching his cell and that prison officials failed to return his personal property not destroyed in the fire. Plaintiff subsequently filed a grievance pursuant to the inmate grievance procedure, in which he requested reimbursement for his property that was destroyed and for the return of that property which was not destroyed. Plaintiff's grievance was denied by defendant Mitchell, the Warden, and on appeal by defendant Robinson, the Regional Administrator. Plaintiff's claim at this stage in the litigation is that he was denied due process in the denial of these grievances. The defendants argue that the Court should not reach the merits of this claim, as they are entitled to absolute immunity in their roles as adjudicators in the grievance system.

I. Quasi-Judicial Absolute Immunity

■ Judges are today, as they were at common law, immune from liability for judicial acts. *Pierson v. Ray*, 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217, 18 L.Ed.2d 288 (1967); *Stump v. Sparkman*, 435 U.S. 349, 364, 98 S.Ct. 1099, 1108, 55 L.Ed.2d 331 (1978). A judge is granted absolute immunity from damage awards so that he can feel "free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher*, 13 Wall. 335, 347, 20 L.Ed. 646 (1872).

This immunity may be extended to other officials who are called upon to make judicial or quasi-judicial decisions. In *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57

L.Ed.2d 895 (1978), the Supreme Court extended absolute immunity to members of the executive branch of the federal government who conducted administrative adjudicatory proceedings which were functionally comparable to judicial proceedings. *Id.* at 512, 98 S.Ct. at 2913. The Court there noted:

> The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process rather than its location. As the *Bradley* court suggested, 13 Wall. at 348–49, 20 L.Ed. 646, controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus, [citation omitted] Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

> At the same time, the safeguards built into the judicial process tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct. The insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal are just a few of the many checks on malicious action by judges. [footnote omitted.] Advocates are restrained not only by their professional obligations but by the knowledge that their assertions will be contested by their adversaries in open court. Jurors are carefully screened to remove all possibility of bias. Witnesses are, of course, subject to the rigors of cross-examination and the penalty of perjury. Because these features of the judicial process tend to enhance the reliability of information and the impartiality of the decisionmaking process, there is a less pressing need for individual suits to correct constitutional error.

> We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages. *Id.* at 512–13, 98 S.Ct. at 2913–14.

In *Ward v. Johnson,* 690 F.2d 1098 (4th Cir.1982), the Court of Appeals was faced with a similar issue. There the Court was called upon to decide whether or not, using the analysis set forth in *Butz,* members of prison disciplinary committees (Adjustment Committees) in Virginia were entitled to absolute immunity. In *Ward* the Court discussed the "functional comparability" test of *Butz* and noted that absolute immunity should not attach to administrative or investigative actions. Focusing specifically on the safeguards which distinguish the "formal" from the "informal" administrative adjudications, the Fourth Circuit relied upon an analysis of *Butz* set forth in the Harvard Law Review:

> While the Court did not limit possible exceptions to these adjudicatory officials, the significance placed on the institutional procedures that restrain their conduct suggests that absolute immunity will not be granted where comparable safeguards are absent. Thus, the exceptions appear limited to participants in 'formal agency adjudication' and likely will not be extended to 'informal adjudication,' which typically involves a wide spectrum of conferences, discussions and settlements outside the framework of a formal hearing.

The Supreme Court, 1977 Term, 92 Harv.L. Rev. 5 at 269–70, n. 35.

The Court then went on to discuss the safeguards which were found to exist in *Butz,* and to formulate a list of seven safeguards. Those safeguards are:

> (1) the administrative proceedings should be "adversary in nature;" (2) the officer exercising the adjudicatory power in the administrative proceeding should not be subject to supervision or direction of other employees engaged in investigative or prosecutorial duties; (3) a party should be entitled to offer either oral or written relevant and non-repetitive evidence on his behalf; (4) the record of the proceed-

ings should be duly recorded and, so recorded, should constitute the exclusive record for decision; (5) the proceedings should be so structured as to assure the exercise by the officer in his decision of independent judgment on the evidence before him; (6) the proceeding should be such as to prevent the danger of retaliatory response by the disappointed inmate to an adverse decision; and (7) there should be reasonable opportunity for the party involved to challenge by appeal the decision.

*Id.* at 1105–1106.

In comparing the procedures outlined in the Department of Corrections Guidelines for the conducting of Adjustment Committee hearings, the Court stated that "so long as those exercising administrative adjudicatory powers are subject generally to these restraints," they are entitled to absolute immunity. *Id.* at 1106. The Court found that the Adjustment Committee procedures fit fully the test of "functional comparability" and held that they were entitled to absolute immunity. *Id.* at 1110.

The Fourth Circuit again had an opportunity to apply the *Butz* analysis in *Segarra v. McDade*, 706 F.2d 1301 (4th Cir.1983)[1]. In *Segarra* the Fourth Circuit extended absolute immunity to prison officials who sit on disciplinary committees in North Carolina penal institutions. *Id.* at 1306. The Court found that the seven elements enunciated in *Ward* existed in the North Carolina context, and found that "the role of the prison officials is functionally comparable to a judge." *Id.* at 1307. The Court noted that to fail to extend absolute immunity to these officials "would be to open the doors of the courthouse to suits that would not only be burdensome, harassing, and time-consuming for prison officials who serve on disciplinary committees, but would expose

them to a financial risk that could result in their refusing to sit on such committees. This could seriously hamper the proper administration of our prisons." *Id.*

Other courts have not taken the "seven-element test" approach in interpreting *Butz*, although all have recognized the need for the actor to be functionally equivalent to a judge in the exercise of his discretion before extension of absolute immunity is appropriate. In *Simmons v. Bellinger*, 643 F.2d 774, 778 (D.C.Cir.1980), for example, the Court developed a three prong test in the aftermath of *Butz*. Those prongs are: (1) that the official be functionally comparable to a judge; (2) that "the nature of the controversy in which the official is forced to become a participant must be sufficiently intense so that there is a realistic prospect of continuing harassment or intimidation by disappointed litigants," and (3) that the system in which the official operates must contain adequate safeguards to deter unconstitutional conduct so that private damage actions are a means of controlling unconstitutional conduct are unnecessary. *Id.* The Court in *Simmons* applied this test in granting absolute immunity to members of the bar association's unauthorized practice of law committee.[2]

II. The Virginia Grievance Procedure

■ The Virginia Department of Corrections has over the years maintained an internal administrative procedure through which inmates could air grievances they might have concerning the conditions of their confinement. At the time plaintiff filed a grievance concerning the loss of his property, the inmate grievance procedure was governed by the Department's Division of Adult Services Guideline # 846 which was enacted on March 31, 1977, and

---

**1.** Parole Board members have also been extended absolute immunity because they exercise a quasi-judicial discretion in granting, denying, and revoking parole. *Pope v. Chew*, 521 F.2d 400, 405 (4th Cir.1975); *Anderson v. Boyd*, 714 F.2d 906, 909 (9th Cir.1983).

**2.** *See also Richardson v. Koshiba*, 693 F.2d 911, 914 (9th cir.1982) (essence of need for absolute

immunity is exercise of judicial discretion), *Verner v. State of Colorado*, 533 F.Supp. 1109, 1115 (D.Col.1982), *aff'd*, 716 F.2d 1352 (10th Cir. 1983) (test is whether work is functionally comparable to that of a judge); *Harris v. Powers* 520 F.Supp. 111, 116 (W.D.Wis.1981) (rationale for absolute immunity in some instances turns upon need to preserve independent judgment).

was revised in minor part on 1 September 1978. The grievance procedure as it existed at that time has been found by the Fourth Circuit to afford inmates due process of law with regard to claims concerning the negligent deprivation of property. *Phelps v. Anderson*, 700 F.2d 147, 149 (4th Cir.1983).

The Commonwealth of Virginia promulgated a new inmate grievance procedure in October, 1982. This procedure has been permanently certified by the Attorney General of the United States as being in compliance with the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.*[3]

Participation in the grievance procedures by an inmate does not preclude litigation in State or federal courts should the inmate be dissatisfied with the result reached within the institution. However, many grievances, at least under the new system, are resolved to the satisfaction of the inmate within the institution.[4]

This Court exercises its discretion in prisoner litigation frequently to continue for a period of up to 90 days complaints brought pursuant to 42 U.S.C. § 1983 which might be resolved within the grievance system. 42 U.S.C. § 1997e. During this 90–day period an inmate is directed to "initiate and diligently prosecute" his administrative remedies within the grievance system. If he is dissatisfied after exhaustion of administrative remedies, the Court proceeds to the merits of his action. If an inmate refuses to exhaust his administrative remedies or is satisfied with the result reached in the grievance procedure, the action is dismissed without prejudice. *See Wilder v. Bichly*, 732 F.2d 152 (4th Cir.1984) (unpublished). During the year in which this Court began to continue § 1983 complaints so that administrative remedies might be exhausted, the number of such complaints filed by inmates decreased by 35%.[5]

These facts provide proof for the assertion that the grievance system is meeting its goals as stated in the 1977 guidelines: (1) to give inmates a regularly available channel for the expression of their grievances, and (2) to foster prompt solutions to institutional problems in a regulated, orderly fashion.

### III. Applying *Ward* to the Grievance Procedure

The first of the seven elements required by *Ward* is that the proceedings be adversary in nature. *Id.* at 1105. The inmate grievance procedure pits an inmate against institutional officials or other inmates and looks to a removed, independent individual to resolve the dispute. The inmate has an opportunity to submit written argument on his behalf and is afforded an interview with the warden. Provisions are set forth for a hearing if resolution of the grievance so requires. Division Guideline # 846, II, Section 1(b).

Second, Wardens and Regional Administrators are not subject to the supervision or direction of other employees engaged in investigative or prosecutorial duties. The guidelines set forth that at each step of the grievance procedure the decision is to be made on the basis of the independent judgment of the official. Division Guideline # 846, II, Section 1(d)(e). While the Warden must forward a copy of all grievances to the Regional Administrator, that copy is submitted "only for reference purposes." Division Guideline # 846, II, Section 1(d).

---

3. *See* Correspondence from U.S. Attorney General William F. Smith to Honorable John McKenzie, Chief Judge, Eastern District of Virginia, 17 April 1984.

4. In calendar year 1983 approximately 92% of all grievances filed were resolved within the institution. *See* Correspondence from James M. Sisk, Manager, Ombudsman Services Unit, Department of Corrections, to the undersigned, 15 February 1984.

5. *See* Memorandum from Robert M. Landon, Director, Department of Corrections, to Honorable Franklin E. White, Director of Public Safety, Commonwealth of Virginia, 1 August 1983. Also during this time period the Court implemented a partial filing fee system for inmates based on *Evans v. Croom*, 650 F.2d 521 (4th Cir.1981), *cert. denied*, 454 U.S. 1153, 102 S.Ct. 1023, 71 L.Ed.2d 309 (1982).

Third, the decision makers have broad ranging authority and power with respect to obtaining evidence and information. An inmate may offer oral or written evidence. Division Guideline #846, II, Section 1(a) and (b), Section 2(a). The Warden may designate an uninvolved individual to gather further information, and he may hold a hearing. Division Guideline #846, II, Section 1(b). In any event, he is to uncover "the necessary facts upon which to base an acceptable, objective decision in each individual's case."

Fourth, the proceedings are preserved by record. Copies of all grievances, complaints and institutional responses are preserved in the record. Division Guideline #846, II, Section 1(d). Action taken by either the Warden or the Regional Administrator and the reasons for a decision are to be preserved in writing. Division Guideline #846, II, Section 1(e), Section 2(a). The testimony of all witnesses is to be summarized and preserved. Division Guideline #846, II, Section 2(c). The record made at the institutional level constitutes the record on appeal. Division Guideline #846, III(e).

Fifth, the proceedings are structured so as to assure the exercise of independent judgment by the Warden and the Regional Administrator. Decisions are to be "objective" in each individual's case. Division Guideline #846, II, Section 1(b). The Warden is given the authority to resolve inmate complaints and his judgment is to be independent of the Regional Administrator. Division Guideline #846, II, Section 1(d)(e); III(f). The decision of the Regional Administrator is likewise to be independent. Division Guideline #846, II, Section 1(a).

Sixth, there is authority in the guideline for an appeal by the inmate. Once the warden reaches a determination, an inmate has an opportunity to object and appeal. Division Guideline #846, II, 1(c). The Warden submits his decision to the Regional Administrator, who has fifteen days within which to reach a decision. An inmate is to be informed of his right to appeal, and it is the responsibility of the lower level staff member to forward all appropriate documentation to the Regional Administrator. Division Guideline #861 III(e) and (f). Although not set forth in the guideline, it has been routine for all appeals of grievances to be forwarded to the Ombudsman's Office for review and recommendation to the Regional Administrator. The Regional Administrator may require further investigation and inquiry in reaching an independent judgment. Allen Affidavit at 5.

Finally, as in *Ward*, there can be no dispute that if absolute immunity were denied to correctional officers participating in the grievance procedure, they would be subject "to a real threat of burdensome and expensive litigation," much of it in "retaliatory response" to the decisions made in the grievance system. *Ward* 690 F.2d at 1108. Prison inmates in general are recognized as prodigious litigators.[6] This District, in particular, has historically been burdened by a large number of prisoner cases. That burden will no doubt increase were members of the grievance process not afforded absolute immunity.

Furthermore, were absolute immunity not afforded, prison officials would be reluctant to participate in the grievance procedure. The stated aim of the procedure, to resolve problems within the institution, would then be frustrated. As the Fourth Circuit noted in *Ward* "it is difficult enough to secure qualified prison employees .... ordinarily prison officials are not generously rewarded for their services and a threat of an award against them personally would be a hazard many would feel themselves not justified in risking." *Id.*

In applying the seven-element test developed in *Ward v. Johnson*, the Court recognizes that the fit of the factors to the inmate grievance procedure is not as snug as it was to the Adjustment Committee procedures. The safeguards are not as stringent in the case of the grievance procedure as they are in the case of the disci-

---

**6.** *See* Fourth Circuit Review, 39 Washington & Lee Law Review 425–26 (1982).

plinary committee. However, there is less likelihood that participants in the grievance procedures will deny inmates procedural due process as the Constitution does not require that the same degree of process be afforded in the grievance procedures as in the Adjustment Committee context.

The Adjustment Committee is comparable to a criminal action in the civilian world. Within the walls of a penal institution, it is the procedure which is used to punish inmates who disobey institutional rules and regulations, and to deter other inmates from similarly violating those rules and regulations. The grievance procedure on the other hand is comparable to a civil action in the civilian world. It settles disputes concerning the validity or practicality of institutional rules and regulations between inmates and the prison administration. It settles private disputes regarding property and liberty deprivations, much as does the common law of torts. In the Adjustment Committee setting the constitution requires advance written notice of the charges, written findings, and generally the right to call witnesses. *Wolff v. McDonnell*, 418 U.S. 539, 564–66, 94 S.Ct. 2963, 2978–79, 41 L.Ed.2d 935 (1974). In the grievance procedure context, the Constitution requires only that the plaintiff be provided "an adequate post-deprivation remedy." *Phelps v. Anderson*, 700 F.2d 147, 149 (4th Cir.1983).

Not only are the requirements less stringent in the grievance procedure context, and thus is the likelihood of violation minimized, but the prejudice accruing to the inmate from a deprivation is less severe. Adverse findings of an Adjustment Committee not only subject an inmate to punishment, they stigmatize an inmate much as a criminal conviction does, affecting the privileges available to him throughout his incarceration, and in some instances (through the loss of good time credits) actually lengthening the period of incarceration. Participation in the inmate grievance procedure on the other hand does not preclude further pursuit of a claim by an inmate in a State or federal court. Nor

does any stigma attach to an adverse determination in the grievance process.

As the protections afforded by the grievance procedure subject those exercising administrative adjudicatory powers "generally," *Ward*, 690 F.2d 1106, to the restraints enunciated in *Ward*, I find that the defendants herein are entitled to absolute immunity to civil suits for damages.

An appropriate order shall issue.

Should plaintiff desire to appeal, written notice of appeal must be filed with the Clerk of the Court within 30 days of the entry hereof.